The QUAKER OATS COMPANY, d/b/a Fisher–Price, Plaintiff,

v.

MEL APPEL ENTERPRISES, INC., Defendant.

No. 88 CV 8500 (KMW).

United States District Court,
S.D. New York.

Jan. 11, 1989.

---

Cowan, Liebowitz & Latman, P.C., New York City, for plaintiff.

Tuchman & Lokos, Springfield, N.J., Brumbaugh, Graubs, Donohue & Raymond, New York City, for defendant.

## MEMORANDUM OPINION

KIMBA M. WOOD, District Judge.

This Memorandum Opinion and Order amends the Order placed on the record at the conclusion of the preliminary injunction hearing held in the above matter before Judge Wood on December 29, 1988.

Plaintiff seeks a preliminary injunction pursuant to Fed.R.Civ.P. 65(a) to enjoin defendant from manufacturing and distributing dolls on the ground that their manufacture and distribution constitutes copyright infringement under 17 U.S.C. § 501 *et seq.*, common law trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a), and unfair competition under New York law. Personal jurisdiction over the defendant is uncontested and venue is proper in this forum. 28 U.S.C. § 1400(a); 28 U.S.C. § 1391(b), (c).

To obtain a preliminary injunction, the movant must demonstrate both irreparable harm and either probable success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor. *Jackson Dairy, Inc. v. H.P. Hood and Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

For the following reasons, the Court concludes that plaintiff is entitled to a preliminary injunction on its copyright, unfair competition, and Lanham Act claims. The Court denies defendant's request for a stay in this matter pending appeal.[1]

---

1. The Court previously denied defendant's request for such a stay at the conclusion of the evidentiary hearing held on December 29, 1988.

## I. Findings of Fact

Plaintiff, the Quaker Oats Company d/b/a Fisher–Price ("Fisher-Price"), is a New Jersey Corporation with its principal place of business in East Aurora, New York. Defendant, Mel Appel Enterprises, Inc. ("MAE") is a New Jersey corporation with a branch office located in New York City. In this suit, Fisher–Price alleges that MAE copied its highly successful "Smooshees" line of dolls by manufacturing and distributing a nearly identical product known as "Lil Stuffers."

Plaintiff alleges that seven of defendant's Lil Stuffers (humanoid figures Jessica, Nicole, Megan, Lauren, Mathew [sic], Baby Jonathan, and Baby Heather) are substantially similar to eight of plaintiff's Smooshees (humanoid figures Tim, Seth, Patty, Sandy, Charly [sic], Beth, Heather, and Wendy).[2] Both plaintiff's and defendant's products have a similar overall appearance. The figures are approximately 5 inches tall. The arms and legs are outstretched, and become "bulbous" (substantially wider and rounder) at the hands and feet. The dolls are soft and squeezable and can be concealed inside an adult hand made into a fist. Both the Smooshees and the Lil Stuffers can be twisted or bent in any direction. The fabric covering of the dolls looks and feels silky and is shiny in appearance except for the hair on some of the dolls, which is a "bonnet" made of a fabric with a thin, felt-like texture, known as "brush tricot." The dolls without "bonnet" hair have hair painted on the fabric. Defendant's dolls all have blonde hair while the plaintiff's dolls have either blonde, black, brown, orange, or red hair. All of the dolls have clothing drawn directly onto their bodies and none of them has separate garments. The faces on both manufacturers' dolls are pink in complexion and the mouths, noses, and eyes are drawn on simplistically in approximately the same posi-

tions. All of the dolls have mouths drawn as small half-moons to appear as smiles. Both manufacturers color their products with bright pastels. Both place their manufacturing labels on the backside of the dolls, but on the Smooshees the labels are sewn vertically in the center of the back, and on the Lil Stuffers they are sewn horizontally in the seat. Plaintiff's dolls sell for approximately $6.00; defendant's dolls sell for $2.00 to $3.00. Finally, defendant's dolls have "Lil' Stuffers" scripted across the belly.

According to the testimony and affidavit of Len Mazzacco, a Fisher–Price designer, an outside toy designer originally presented the idea for Smooshees to Fisher-Price in April of 1986. Mazzacco testified that the Smooshees concept, soft-sculptured humanoid and animal[3] dolls which can be squeezed in and out of small objects, was novel to the toy industry. Sold with accessories, such as baskets and toy carriages into which the dolls can be stuffed, Smooshees have different names and outfits. They are, however, all tied together by the same essential appearance described above.

Mazzacco and a Fisher–Price pattern designer, Christine Afgar, described for the Court how they spent over a year developing prototypes after the Smooshees concept was created. Selected sketches of the dolls were drawn in hundreds of shapes and sizes, which were then matched with different facial expressions and color combinations. Sketches were later turned into three dimensional forms by Afgar. Afgar said she experimented with numerous different combinations of patterns and sizes before Mazzacco was satisfied with the final product.

At the hearing, Afgar compared the defendant's Lil Stuffers humanoid doll pattern to plaintiff's humanoid Smooshees pattern. According to Afgar, the Smooshees

---

2. Fisher–Price received from the Register of Copyrights the following Certificates of Registration for the dolls presently at issue: Tim—VA 322–838, Seth—VA 298–686, Patty—VA 322–836, Sandy—VA 322–835, Charly—VA 322–833, Beth —VA 298–687, Heather—VA 322–832, and Wendy—VA 322–837.

3. Defendant also manufactures animal Lil Stuffers, but plaintiff does not challenge them in this suit.

doll pattern is atypical of doll patterns because it consists of three pieces rather than the 15 to 20 pieces comprising a typical fabric doll pattern. Having previously taken apart one of defendant's humanoid dolls to study its pattern, Afgar testified that, with minor exceptions, the Lil Stuffers pattern is almost identical to plaintiff's. The Court, upon its own examination, similarly concluded that the overall shape, size, and configuration of the patterns are almost identical. The only differences uncovered by Afgar were that defendant's pattern was cut in three places where plaintiff did not use a cut, defendant's pattern did not contain a crotch dart, and the hair pattern used on Lil Stuffers is simpler.[4]

Afgar further noted that several of the common features of the two different lines of dolls seem suspiciously coincidental. Both plaintiff's and defendant's dolls contain a "face cell"—a piece of fabric cut in the same size of the doll's face and sewn inside the doll's head, such that the only way to tell that the doll contains a "face cell" is to take it apart. Afgar testified that she has never seen another doll of this type with a "face cell." She also showed the Court that on both dolls the place of closure is in the same spot on the doll's back—even though Fisher–Price placed the closure at that spot on the doll's back only because that is where they affix their label; she testified that because defendant's label is attached to the *seat* of the doll, there appears to be no reason for the closure to be at exactly the same spot as the Fisher–Price doll's closure. Afgar also testified that the brush tricot hair found both on Smooshees and Lil Stuffers had not been used previously in the industry. Finally, Afgar testified that both plaintiff's and defendant's doll's feet are formed by a "foot dart" in the center of the foot. According to Afgar, most dolls have a sole rather than a "foot dart"; she originally placed the "foot dart" on the side, and only later moved it to the center. Afgar concludes that MAE could not have created the pattern for its dolls without directly copying from her Fisher–Price pattern. The Court finds Afgar's testimony credible and supported by the exhibits referred to during her testimony.

Defendant concedes that defendant's idea for a soft sculptured doll was inspired by Fisher–Price. MAE's Director of Design, George Kress, admits that he had a Smooshees doll in his office while he was designing the Lil Stuffers line, and that he referred to it during his designing. MAE states, however, that it is a common practice for small companies (such as itself) which lack the resources of a company like Fisher–Price to engage in the "parallel development of an established product." According to both Kress and Mel Appel, President of MAE, Appel commonly instructs Kress, as he did during the development of the Lil Stuffers, "to keep as far away from the design features of other companies' products as possible while still capturing the idea of the product." Kress testified that at Appel's direction, he personally sketched two-dimensional figures for the Lil Stuffers line and sent them (Ex. 22) to his pattern maker in Hong Kong.

Defendant submitted at the hearing a "Declaration" from its pattern maker stating that he created the Lil Stuffers patterns solely from the two-dimensional art work sent to him from Kress and was never given the Smooshees product or any other doll to use as a sample or standard. Because the pattern maker in Hong Kong did not testify at the preliminary injunction hearing, the Court was unable to assess the declarant's credibility. The Court has examined the sketches in Ex. 22, both plaintiff's and defendant's patterns, and both plaintiff's and defendant's dolls. For purposes of this preliminary proceeding, the Court does not find it credible that defendant's agent in Hong Kong could

---

**4.** Plaintiff's claim that defendant's dolls are similar extends only to appearance and not to quality. Fisher–Price submitted the affidavit of its Product Safety Manager whose tests, consisting of washing and drying the product six times, visual inspection, and disassembly, showed that Lil Stuffers were of inferior quality. The study found that the printing quality and color fastness on the defendant's dolls are poor, and that the seam construction on defendant's dolls is of inferior quality. The Court credits this study. *See* Pilarz Affidavit.

have produced a final product so remarkably similar to Smooshees based only on the Kress two dimensional drawings.

Smooshees first reached retail stores in the United States in January of 1988. The introduction of the product was supported by television commercials and in-store promotions. According to plaintiff, Smooshees have proved very popular with both the trade and the target market, young girls. Based on market research conducted in the regular course of plaintiff's business in September 1988, 77 percent of girls aged 6–9, when shown a photograph of Smooshees toys without the packaging and without the name, identified them as Smooshees.[5] Sales of Smooshees to date exceed $20 million.

Plaintiff first learned of the existence of Lil Stuffers at the Tokyo Toy Fair in June of 1988. Soon afterwards, plaintiff began an investigation to determine whether defendant's dolls were being offered for sale in the United States and to obtain the actual products for examination. Through the efforts of a private investigator, plaintiffs obtained two Lil Stuffers toys on August 30, 1988 from MAE's office in Short Hills, New Jersey. It was not until the end of September that plaintiff was able to confirm that Lil Stuffers were being offered for sale in stores in the United States. By mid-October, Fisher–Price obtained the full line of Lil Stuffers from a toy store in Hong Kong.

MAE maintains no warehouse facilities in the United States and its products are sold only to accounts capable of importing toys directly from the Orient. At the time this suit was brought, defendant had orders for humanoid Lil Stuffers totalling $187,365; all but one order, for $28,845, had been shipped to the United States prior to this suit. Plaintiff is seeking relief only as to goods not yet shipped to the United States.

## II. The Copyright Claim

■ In order to establish a *prima facie* case of copyright infringement, "a plaintiff must establish [1] ownership of the copyright and [2] copying by the defendant," *Reyher v. Children's Television Workshop,* 533 F.2d 87, 90 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed. 2d 588 (1976). A *prima facie* case, sufficient if unrebutted to support interlocutory relief, is made out on the first element by a submission of copyright registration, which carries with it a presumption of copyright validity and ownership, and is *prima facie* evidence of the facts stated therein. *Id.* at 1092 n. 1; 17 U.S.C. § 410(c). Success is likely on the second element if plaintiff shows that defendant had access to the copyrighted work and that the two works are substantially similar. *Eden Toys, Inc. v. Marshall Field & Co.,* 675 F.2d 498, 500 (2d Cir.1982).

Plaintiff has established the validity of its copyrights. Fisher–Price has introduced into evidence copies of the copyrights for all of the dolls at issue; defendant does not dispute the validity of these copyrights. Moreover, because the Smooshees doll is an original design which does not incorporate or expand upon "any standard doll features," the Smooshees doll design is entitled to the broadest possible scope of protection. *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 916–917 (2d Cir.1980).

Copying has also been established in this claim. Plaintiff has shown both that the defendant had access to the copyrighted work and that the two works are substantially similar. *Eden Toys, Inc., supra,* 675 F.2d at 500. Defendant's designer admitted that he had a copy of the Smooshees product in his office while he was designing the Lil Stuffers, and as discussed *ante,* the Court finds persuasive at this juncture the evidence presented by Fisher–Price that defendant copied its patterns directly from plaintiff's dolls.

---

5. This survey, conducted by a professional marketing research firm, MarketFacts, of 154 girls aged 6–9, relied on parents to question their children at home. Because the test conditions were not rigorously controlled, this data may be susceptible to error. The study, however, is sufficiently reliable for purposes of this preliminary hearing.

Substantial similarity—the second part of the copying prong—is determined by applying the "average lay observer test." As described by Judge McMahon,

the test for infringement in a case such as this is whether an average lay observer would find a substantial similarity between the copyrighted work and the alleged copy. In applying this test, we do not examine the dolls detail by detail, counting those details, which upon close inspection, appear similar. Rather, we look to the overall appearance of the dolls to see if the combination of these details creates a general impression of substantial similarity. *Fisher Price Toys, Div. of Quaker Oats Co. v. My-Toys Co., Inc.*, 385 F.Supp. 218, 220 (S.D. N.Y.1974).

*See also Novelty Textile Mills v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir. 1977). A comparison of plaintiff's and defendant's dolls demonstrates that plaintiff's and defendant's dolls are substantially similar. Both sets of products have the same size and similar distinctive shape and proportions, facial features, hair and softness, which create their overall aesthetic appeal. When viewed by an untrained eye, the gathered brush tricot hair found on the Smooshees dolls looks almost identical to that on Lil Stuffers dolls. The fact that defendant drew slightly different style bangs and shaped the fabric hair in a somewhat different form does not change this effect. Both manufacturers use bright pastel colors which create a similar overall appearance. Both lines of dolls have one-piece outstretched arms and legs, made puffier at the ends to create the impression of oversized hands and feet. Additionally, the skin tone and overall facial appearance of the dolls are nearly identical. The mouths, cheeks, and eyes, though differing somewhat in detail from doll to doll, create a similar impression on the observer.

Defendant notes several differences in detailing, such as variations in cheek coloring, the prominence of freckles, the position and detailing of the eyes, and a ½" difference in height, but these minor varia-tions do not change the overall similarities in appearance. "[D]ifferences and similarities are not to be assessed separately, but rather the dolls should be evaluated in 'total concept and feel.'" *Original Appalachian Artworks, Inc. v. Blue Box Factory*, 577 F.Supp. 625, 631 (S.D.N.Y.1983) (citing *Warner Bros. Inc. v. American Broadcasting Co.*, 720 F.2d 231, 241 (2d Cir. 1983)). "We have frequently held that where such substantial similarity is found, slight differences between a protected work and an accused work will not preclude a finding of infringement." *Durham Industries, Inc., supra*, 630 F.2d at 913. Here, defendant's dolls capture the "essential aesthetic appeal of plaintiff's copyrighted work," which is all that is required for an unlawful infringement. *See Novelty Textile Mills Inc., supra*, 558 F.2d at 1093.

As for those aspects of the two lines of toys that are obviously similar, defendant suggests that plaintiff is attempting to monopolize the idea of a small-sculptured doll which a child can stuff into other objects, quoting *Reyher:* "[i]t is an axiom of copyright law that the protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself." *Reyher, supra*, 533 F.2d at 90. Defendant claims that it has made its dolls sufficiently different to avoid infringement, citing *Eden Toys:* "[e]ven if an alleged copy is based on a copyrighted work, 'a defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiffs.'" *Eden Toys, Inc.*, 675 F.2d at 501 (quoting 3 *Nimmer on Copyright* § 13.03[B], at 13–37 (rev. ed. 1980)).

Defendant argues that the facts here are similar to *Mattel, Inc. v. Azrak–Hamway Intern, Inc.*, 724 F.2d 357 (2d Cir.1983), a case involving competing five and one-half inch toy dolls described by the court as having "a sculptor's exaggerated rendering of a bodybuilder's body with shortened legs." [6] In *Mattel*, Judge Owen and the Second Circuit refused to issue a prelimi-

---

**6.** MAE introduced into evidence in this case the actual dolls at issue in the *Mattel* case.

nary injunction despite the existence of a copyright, a finding that the doll's bodies were "very similar," and an admission by defendant that it "gave its sculptor a Mattel doll to show him what kind of doll it wanted...." *Id.* at 360. The Second Circuit was careful to note in *Mattel* that although defendant's designer had been given a copy of plaintiff's doll,

> the district court apparently credited the evidence of [defendant's] expert on human anatomy that [defendant's] doll was not a direct copy of the Mattel doll, but rather was simply another artist's rendering of the human form with an exaggerated musculature.... Though the dolls' bodies are very similar, nearly all of the similarity can be attributed to the fact that both are artist's renderings of the same unprotectable idea—a superhuman muscleman crouching in what since Neanderthal times has been a traditional fighting pose. The rendering of such an idea is not in itself protectable; only the particularized expression of that idea.... In this case a lay observer would recognize certain differences in the way the two sculptors have created images of strength by overemphasizing certain muscle groups. *Id.*

The instant case differs from *Mattel* in several ways. Here, the Court finds credible, for purposes of granting preliminary relief, plaintiff's evidence that defendant copied Fisher–Price's patterns rather than relying on Smooshees only for the unprotectable idea. In addition, although the idea for a soft-sculptured doll that can be stuffed into objects is unprotectable, defendant's rendition of its humanoid dolls is not distinguishable under the "lay observer test" from plaintiff's humanoids. Finally, in *Mattel,* the copyrighted work was based on a common, preexisting design and the similarities in defendant's toy were found to emanate not from copying elements added by the copyright owner but from the similarity of subject matter. Here, plaintiff's work is not a version of a standard human form or a standard doll form but an abstract work which is entirely original. Thus, plaintiff has established likelihood of success on the merits for its copyright claim.

### III. Trademark Infringement

Fisher–Price also seeks to protect the distinctive visual appearance of its Smooshees dolls. To succeed on either the state unfair competition claim or the federal trademark claim, Fisher–Price must first show that there is a likelihood of confusion between its trade dress[7] and that of the second comer. *Ideal Toy Corp. v. Chinese Arts & Crafts Inc.*, 530 F.Supp. 375, 379 (S.D.N.Y.1981) (citing *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 953 (2d Cir.1980)).

#### a. *New York Unfair Competition Claim*

■ Based on the evidence already discussed in this Opinion, the Court concludes that plaintiff has shown a likelihood of success on its state unfair competition claim in that the defendant's dolls are confusingly similar to plaintiff's dolls. This finding is bolstered by the fact that defendant's goods are directly competitive with plaintiff's and are sold in stores where similar products are usually found in close proximity to one another. A customer could easily pick up a Lil Stuffers thinking it was part of the Smooshees line. Moreover, the potential for confusion is enhanced because sales of this product are child-driven, *see Ideal Toy Corp. v. Adanta Novelties Corp.*, 223 F.Supp. 866, 868 (S.D.N.Y.1963) (sophistication level of consumer is lower when purchase is motivated by children), and the product is inexpensive. *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir.1979) (modest cost of product not conducive to careful shopping). Plaintiff is thus likely to succeed on its unfair competition claim.

#### b. *Lanham Act Claim*

■ To succeed under the Lanham Act, Fisher–Price must demonstrate (in addition

---

**7.** Trade dress under § 43(a) of the Lanham Act "involves the total image of a product and may include features such as size, shape, color or color combinations, texture [or] graphics." *Le Sportsac, Inc. v. K–Mart Corp.,* 754 F.2d 71, 75 (2d Cir.1985).

to showing that MAE's product is confusingly similar to its own) that MAE copied certain nonfunctional design features of Smooshees which had developed a secondary meaning in the eyes of consumers so that consumers were misled into believing that the Lil Stuffers came from the same source. *Mattel, supra,* 724 F.2d at 360–361. *Perfect Fit Industries, supra,* 618 F.2d at 953, described the secondary meaning doctrine as holding that

> a descriptive or geographical mark receives protection against copying only if consumers have come to associate it with a particular manufacturer or source. When this association is established and the mark has thus acquired secondary meaning, a second comer is barred from using it because such use is virtually certain to create confusion in the public mind as to the source of the product.

Secondary meaning may be determined by factors such as plaintiff's advertising and sales record, a survey of customer recognition, and conscious imitation of plaintiff's product. *Ideal Toy Corp. v. Chinese Arts & Crafts, Inc., supra,* 530 F.Supp. at 379 (citations omitted). Plaintiff has met all three of these criteria.

Fisher–Price has embarked on an extensive national advertising campaign which has resulted in sales of Smooshees in 1988 of at least $20 million. This is a phenomenal success considering that Smooshees were introduced into the retail market only within the last year. Plaintiff has offered into evidence a consumer survey which indicates an extremely high recognition factor for Smooshees among the targeted group. As discussed *ante,* the Court believes this study is sufficiently reliable for purposes of this proceeding.

Furthermore, conscious imitation of the trade dress of another is itself strong evidence that secondary meaning exists. *See e.g., Harlequin Enterprises, Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 950 (2d Cir.1981); *RJR Foods, Inc., supra,* 603 F.2d at 1060; *Ideal Toy Corp., supra,* 530 F.Supp. at 380. The testimony of the Fisher–Price pattern designer as to the striking similarity between plaintiff's and defend-

ant's patterns as well as the testimony of MAE employees Kress and Appel indicate to the Court a strong likelihood that defendant's product was consciously copied. Thus, plaintiff would be likely to succeed on the merits in its attempt to prove secondary meaning.

IV. Irreparable Harm

For the preliminary injunction to issue, plaintiff must show, in addition to a likelihood of success on the merits, that it would suffer irreparable harm in the absence of such an injunction. As for plaintiff's claim of copyright infringement, irreparable harm is presumed once a likelihood of success on the merits is shown. *American Metropolitan Enterprises of New York, Inc. v. Warner Bros. Records, Inc.,* 389 F.2d 903, 905 (2d Cir.1968). Under the unfair competition and trademark claims, irreparable harm will be found where there is a high probability of confusion. *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,* 832 F.2d 1311, 1314 (2d Cir. 1987). Confusion not only reduces sales but threatens plaintiff's good will if consumers mistake defendant's inferior goods for those of the defendants. As noted previously, the Court credits plaintiff's testimony that defendant's goods are of inferior quality.

The price difference between Smooshees and Lil Stuffers makes a damage computation based on lost sales impracticable. In addition, the continued presence of defendant's Lil Stuffers in the market place could also inhibit plaintiff's plans to add new dolls to its Smooshees line. If defendant is allowed to continue to manufacture Lil Stuffers, other manufacturers would have less incentive to refrain from selling infringing products. The Court, thus, finds that plaintiff would suffer irreparable harm if a preliminary injunction does not issue.

Finally, the balance of hardships in this case tips decidedly in plaintiff's favor. The Smooshees line represents a major investment of time and money by Fisher–Price. For the defendant, on the other hand, total sales of the Lil Stuffers humanoid figures in the United States as of the time this case

was filed was less than $200,000—a small fraction of MAE's toy business. Moreover, defendant presently has only one outstanding order for approximately $25,000. Hence, the equities weigh in favor of plaintiff.

## V. Laches

Defendant has asserted the affirmative defense of laches, claiming that plaintiff improperly delayed bringing this action once it first learned about defendant's product. The Court finds no merit to this claim.

Plaintiff did not know about the possible existence of the Lil Stuffers line until the Tokyo Toy Fair in June of 1988. Plaintiff commenced an investigation in the United States promptly thereafter but did not obtain a sample of the allegedly infringing doll until late August of 1988. Fisher–Price was not able to confirm that the product was offered for sale in the United States until the end of September of 1988. Finally, plaintiff was unable to supply its attorneys with the full line of Lil Stuffers until October 20, 1988; these samples had to be obtained from a toy store in Hong Kong. Given that only a six to seven week delay ocurred before plaintiff brought this motion, the Court finds that this was not an unreasonable amount of time for counsel to investigate the facts and legal theories underlying these claims. *See Horgan v. Macmillan, Inc.*, 789 F.2d 157, 164 (2d Cir.1986) ("Parties should not be encouraged to sue before a practical need to do so has clearly been demonstrated"); *American Greetings Corp. v. Kleinfab Corp.*, 400 F.Supp. 228, 233–234 (S.D.N.Y.1975) (three and one-half month delay between plaintiff's first knowledge and the bringing of the injunction was not unreasonable).

Therefore, for the reasons discussed above, plaintiff's motion for a preliminary injunction is hereby granted. Defendant's oral motion for a stay in this case pending appeal is denied.

SO ORDERED.